UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) 1:19-cr-00229-RLY-DML-1 |
| MAHDE DANNON, | ) |
| Defendants. | ) |

**DEFENDANT'S SENTENCING MEMORANDUM**

Mahde Dannon is supportive of his brother and hopes for the best possible outcome for his brother's pending charges. He is legally responsible for his brother's acts taken in furtherance of a joint scheme. There were, nonetheless, marked differences in the motives and level of participation between the brothers in that joint scheme that are worthy of consideration in a sentencing decision. The brothers were not two peas in a pod. Avarice, rather than ideology, was the driving force and motivation for Mahde's participation in the offense. Moyad's circumstances were markedly different. Mahde's individual conduct may inform the weight to be afforded the elevated Guideline offense level and criminal history category suggested by the application of a U.S.S.G. § 3A1.4(a) adjustment applicable to the case in an overall sentencing decision.

At a number of levels, the common metaphor of a slow-boiling frog is descriptive of Mahde's participation in in a series of events that commenced with a casual encounter with an undercover agent posing as a business owner who might be interested in hiring Mahde and ended with an agreement to produce "ghost guns" expected to be shipped to the Middle East for use by ISIS, a designated foreign terrorist organization. A methodical slowly-escalating investigation and sting operation provided a series of off-

ramps where Mahde might have drawn a line at conduct that he was unwilling to engage in. Mahde was 19 years old when first approached regarding firearms sales and 20 when the sales escalated to proposed international distribution. Blinded by a supposed huge pay day, he followed the path outlined by investigating agents to the end of the saga.

## Facts

Mahde and Moyad Dannon appeared on the FBI radar screen as a result of comments that their father had reportedly made to a co-worker following a December, 2015 mass shooting in San Bernardino, California, suggesting that he might bring an AK-47 to the company's Christmas party. A review of 2015 social media (shortly after Mahde turned 17 years old) revealed videos of the brothers shooting full-automatic rifles at a shooting range and posing with what appeared to be AK-47 style rifles – bb guns, as it turned out. Docket 2, p.6. A law enforcement interview with a friend of the family suggested that Moyad had been researching ISIS and other terrorist groups online and expressed troubling behavior at a local mosque. Docket 2, pp .7-8. In 2018, Mahde, when arrested on an unrelated charge, and Moyad, when questioned upon a return trip from Jordan, each acknowledged ownership of AR-15 style rifles used at a local gun range. Docket 2, pp. 9-10. The danger signs apparently merited further law enforcement inquiry.

In April of 2018, an FBI Confidential Human Source made a casual contact with Mahde, who was working at a jewelry kiosk in Indianapolis. The CHS represented himself as a business owner and Mahde suggested interest in working as a salesman. After a series of casual lunch meetings, Mahde noticed a large roll of cash carried by the CHS, suggested that he wanted "a piece of whatever action" the CHS was into and did

not care about the legalities. At a June 11, 2018 meeting, the CHS revealed that he was a convicted felon who could not legally purchase firearms. The two discussed the possibility of Mahde obtaining guns and the proposition that the two could make money from such transactions.   Docket 2, pp. 17-18.

By June 16, 2018, Mahde produced 2 handguns and a starter pistol which he claimed to have stolen and sold them to the CHS for $1000. A week later, the CHS relayed that he had sold the weapons to a friend who was interested in more. Mahde suggested that he was interested in assembling firearms from mail order parts or 3D printing and producing untraceable "ghost guns". He claimed to have assembled an AR-15 rifle in the past.  He said that he and his brother could build the guns from parts around an "80% lower receiver".   Docket 2, pp. 18-19. Subsequent conversations raised the speculation that the firearms could be built for $500 and sold for $1500. Mahde stated that he had noticed that guns without serial numbers were legal and popular on ArmsList.com.  The weapons were supposed to be registered, he said, but no one complied with the registration requirement.   Docket 2, p. 20.

By July 11, 2018, Mahde had obtained and sold another firearm, a stolen Bersa .380, to the CHS. Docket 2, p. 21.

A week later, the CHS raised the topic of ISIS execution videos. Mahde claimed to have watched a large number of such videos.     Docket 2, p. 22.

On July 18, 2018, Mahde presented the CHS with an AR-15 "80% lower receiver" that he had purchased from a licensed firearms dealer through an internet purchase, presumably for the CHS to inquire as to the feasibility of its use in assembling an untraceable firearm. That same day, he sold a Keltech KSG 12-gauge shotgun to the

CHS for $800 and on July 24, 2018 sold a Springfield M1 .30 caliber rifle. Moyad was present for the July 24 transaction. Docket 2, pp. 22-24.

The "ghost gun" plan was hatched on August 14, 2018. The CHS lead the two brothers to an office park and identified a potential rental space that could be used to assemble the weapons. They were introduced to an undercover law enforcement employee (UCE1). The proposal involved 1) The Dannon brothers would obtain the "80% lower receivers" and provide them to UCE1; 2) a friend of UCE1 would mill out the receivers and UCE1 would return them to the Dannons; and 3) the Dannons would assemble the weapons using parts purchased off the internet. The initial plan was to assemble 3 weapons. The boys were told that the guns would be going "south of the border". Both the CHS and UCE1 represented themselves as members of the Muslim faith ("one of us"). Docket 2, pp. 24-26.

On August 17, 2018, Mahde delivered 3 AR-15 lower receivers to CHS1. CHS1 provided Mahde an exit ramp – an opportunity to back out of the deal before they became involved with "a bunch of Mexicans down south". Document 2, p. 26. Mahde did not take the opportunity to call off the endeavor.

On August 24, 2018, Mahde sold a stolen Panther Arms A-15 rifle to the CHS for $1400, suggesting that he could use the profit to purchase parts for the future assembly of firearms. Docket 2, pp. 27.

On September 6, 2018, the 4 participants met in an apartment and the boys assembled the 3 firearms from parts they brought to the meeting. They were payed $6000 for the 3 guns and were told that the guns were destined to be taken to Mexico. Docket 2, pp. 27-29.

On September 13, 2018 Mahde sold a Bushmaster Carbon A-15 rifle to CHS for $1000. The following week, UCE told Moyad that the weapons had arrived at their destination and that the buyers were pleased. The two discussed building another ten guns and agreed to a tentative price of $1500 to $2000 per rifle. He indicated that he would discuss the price with Mahde, who was receiving a cut of the proceeds in exchange for ordering the parts online. Docket 2, pp. 29-30.

On September 20, 2018 CHS1 met the brothers at the office space rented for the gun building operation to accept the delivery of furniture. The following day, Moyad ordered ten AR-15 lower receivers from a gun dealer, to be delivered to Mahde. In a phone call made that day, CHS and Mahde agreed upon a price of $1700 to $1800 per rifle for the next ten guns assembled. Docket 2, pp. 31-32.

On September 28, 2019, Mahde met UCE4, whom he had met during the move into the office space, and sold him a MAD Tactical Systems MG-G4 rifle for $1800. Docket 2, p. 32.

In the interim, the FBI learned that the IP address associated with the Dannon family had made connections with an IP address associated with ISIS propaganda. Docket 2, pp. 32-33.

About November 28, 2018, the brothers met CHS1 and UCE1 at the rented office space, assembled 5 rifles, and were paid $10,000 - $9000 for the weapons and a $1000 advance on the next 5 rifles. Mahde suggested that the brothers could obtain parts to manufacture full-automatic rifles using parts that could be obtained overseas. Docket 2, pp.34-35. UCE1 once again mentioned that the assembled weapons were going to Mexico. Docket 2, p.35.

On December 17, 2018, discussions between UCE1 and Moyad alone commenced in earnest. Moyad was introduced to UCE5, a potential firearms purchaser, in a meeting conducted in a local restaurant. The three discussed firearms manufacturing, shipping, and pricing, as well as selling guns south of the border. Docket 2, pp. 35-36. Driving back from the meeting, Moyad confided that he did not believe UCE5 intended to send any purchased weapons to Mexico. He suspected that UCE5 was a militia member who would keep the weapons. Docket 2, p. 36.

On February 2, 2019, UCE1 called Moyad to discuss building a fully- automatic rifle for a trusted contact "out west". On February 5, 2019, both brothers met UCE1 at the office space and assembled a fully automatic rifle for shipment to Arizona, where UCE1 and Moyad would meet the trusted contact (CHS2). Docket 2, pp. 37-38. On February 13, 2019 Moyad flew to Arizona, where he, UCE1, UCE2, and UCE2 met with CHS2, the prospective buyer "out west".

The FBI operation, the culpability of the two brothers, and, perhaps most significantly, the nature of potential charges, took a sharp left turn during this meeting. The change in plans and a shift of goals to Islamic State ideology were focused on Moyad alone. CHS2 disclosed that he wanted to ship weapons through Mexico to Syria, Libya, and Iraq. CHS2 suggested that he did not care about profit, but had a single goal – to "defend the land, religion, and honor". Docket 2, pp. 39. CHS2 suggested that Moyad speak with the potential overseas buyers, members of "the Caliphate of Syria, Iraq, and Libya", about any potential changes to the weapons. CHS2 ordered five weapons to be shipped overseas for testing and promised to buy an additional 50 weapons in increments of five. Docket 2, pp. 39-40.

The following day, Moyad met with CHS2 at a coffee shop in Arizona. CHS2 agreed to purchase the test-fired weapon for $7000 and agreed to purchase an additional 50 weapons for $10,000 each. The conversation thereafter focused on ideology. CHS2 found a receptive participant in Moyad. Moyad volunteered knowledge about the warring factions in Syria and was provided information concerning a proposed future encrypted conversation that could be arranged between Moyad and an individual connected to the Caliphate State (ISIS). Moyad expressed interest in traveling overseas and was provided details of a proposed journey from Dubai, through Istanbul, in on to Syria. Moyad suggested that he was willing to make the journey. Docket 2, pp. 40-42.

On February 16, 2019, Moyad made contact with the supposed ISIS representative using an encrypted application suggested by CHS2. The representative was, of course, an FBI Online Covert Employee (OCE). On February 21, 2019, a lengthy conversation ensued. Moyad confirmed the OCE's affiliation with ISIS and suggested that he had not yet made a pledge of loyalty to ISIS but that he was "on the right path with its followers". Moyad suggested that he was the OCE's brother and on the same path. Docket 2, pp. 42-43. Encrypted conversations thereafter between Moyad and the OCE took place from February 25, 2019 through March 6, 2019 and focused on the expertise that Moyad might contribute to the Islamic State in Syria and the details of how he might enter the country. Docket 2, pp. 42-45. The conversations continued thereafter concerning events in Syria. By March 16, 2019, the OCE asked if Moyad was willing to help the Islamic State. Moyad replied "I am all ears". Docket 2, pp. 46-57

On March 19, 2019, UCE2 and UCE3 met with Moyad in Indianapolis. They

proposed that Moyad provide an additional 5 weapons in order to test an alternative method of getting the firearms overseas – through New Jersey. The plan continued to involve shipping the 50 weapons previously ordered through Mexico. The idea was that shipping through New Jersey would be expected to get weapons to ISIS fighters more quickly. Docket 2, pp. 48-49.

Conversations between Moyad and OCE continued and involved details of when and how Moyad might travel to Syria to provide expertise and assistance to Islamic State militants. Docket 2, pp. 49-51.

The only moment in which undercover agents confirmed that Mahde had been made aware of the proposed change in destination for the weapons took place, ironically, on April 1, 2019.   CHS1 asked Mahde who the guns were going to.   Mahde replied "us" and stroked his beard to convey his understanding of who "us" might be. Docket 2, p. 52. While Mahde may have been left out of all of the events and conversations concerning the change of plans, he knew of the new destination, the size of the order, and the negotiated prices. He raised no objection thereto. It was and remains clear that Mahde had little, if any, interest in ideology or the Islamic State but was focused on a supposed huge pay day for the venture.   A verbatim summary of the conversation merits consideration.

> CHS1 told Mahde that money is not his motivation for being involved in the illegal gun deal, and CHS1 is not making any money off of the deal. Mahde refers to Moyad as "the chef' and himself as "the businessman." According to Mahde, Moyad told Mahde that the gun deals were all for a bigger cause, and that money was not the motivation. Mahde told CHS1 that Moyad would build the weapons for free, but Mahde won't do it for free. Toward the end of the conversation CHSI told Mahde that he can't be doing anymore stupid stuff, and Mahde replied that he (Mahde) was not going to risk a quarter of a million dollars. Mahde also told CHSI that he wants "it" [meaning a successful/profitable gun building operation] more than CHSI

does.   Docket 2, p. 52, section 152(d).

Discussions between Moyad and the OCE concerning Moyad's travel plans continued. On May 2, 2019, Moyad met CHS2 in Cincinnati to discuss the trip. He wanted CHS2 to meet him in Turkey and introduce him to the person who would escort him into ISIS-controlled territory. That same day, Moyad messaged the OCE to tell him that he wished to travel to ISIS-controlled territory and asked the OCE to coordinate the details with CHS2. Docket 2, pp. 53-54. Arrest warrants were issued shortly thereafter and the supposed plan came to a crashing halt.

**Guidelines**

The advice of the Sentencing Guidelines as to a reasonable sentence for Mahde's offense of conviction was 57-71 months prior to application of the USSG §3A1.4(a) adjustment (Adjusted Offense Level 25, Criminal History Category I, PSI, Docket 92, ¶¶ 33-34, 40-41).

An alternative Guideline calculation considering the seven firearms charges proposed to be dismissed in the plea agreement would have grouped with the offense of conviction and predicted a significantly higher recommended range of 87-108 months. That alternative calculation would have predicted a base offense level of 20 (USSG §2K2.1(a)(3)(B)); Mahde was a "prohibited person" by virtue of a pending felony theft charge and the weapons described in Counts 6 and 7 were machine guns as defined 26 U.S.C. 5845(a).   Adjustments of 4 levels (8-24 firearms transferred or produced; USSG §2K2.1(b)(1)(B)) 4 levels (altered serial number; USSG §2K2.1(b)(4)), 4 levels (trafficking of firearms; USSG §2K2.1(b)(5)) would raise the total offense level to 32.   A 3-point reduction for acceptance of responsibility would have resulted in a final offense level of

29 – 87 to 108 months at criminal history category I. The defense suggests that a sentence sufficient, but not greater than necessary, to punish all of the offense conduct might fall within that 87 to 108-month range.

A mechanical application of USSG §3A1.4(a) to the offense level and criminal history category is breathtaking – a recommended range of 360 months to life, truncated to 240 months by the applicable statutory maximum penalty. PSI, Docket 92, ¶ 78.

Mahde is responsible under the Sentencing Guidelines for his brother's actions in acceding to the change of plans that would have resulted in weapons being transferred to a designated foreign terrorist organization had the agreement been made with persons other than undercover agents and human sources.  The agreement was within the scope of the jointly undertaken criminal activity, in furtherance of that activity, and, while perhaps not reasonably foreseeable, Mahde was later provided actual knowledge of the agreement and continued to participate. See, USSG §1B1.3(a)(1)(B). The adjustment described in USSG §3A1.4(a) applies to the facts of this case and the parties have stipulated to its applicability.  Plea Agreement, Docket 80, ¶ 19(C). The adjustment applies where the offense "involved, or was intended to promote, a federal crime of terrorism", a term defined in 18 U.S.C. § 2332b(g)(5). The offense of conviction is listed as such an offense in a lengthy litany of such offenses.

Application of this Chapter 3 adjustment is uncommon in this district and within the 7th Circuit.  Its closest cousin is the Career Offender Guideline (U.S.S.G. § 4B1.1), with which the Court and the lawyers in this case have a good deal of experience.  These guidelines, as are any other guideline, are advisory only. *United States v. Corner*, 598 F.3d 411 (7th Cir. 2010). A sentencing judge is free to reject that advise categorically, as

well as in a particular case.

In 1994, Congress directed the Sentencing Commission to create a sentencing enhancement for any felony involving or intending to promote terrorism. See Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 120004, 108 Stat. 1796, 2022. The Sentencing Commission did so, and over time, that enhancement evolved into its current form. See James P. McLoughlin Jr., Deconstructing United States Sentencing Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations, 28 Law & Inequality 51, 51-52 (2010) (explaining evolution of terrorism enhancement). When it applies, the enhancement dramatically increases the sentences imposed on individuals convicted of federal crimes of terrorism. It does so in an unusual way—increasing not only the offense level, but also a defendant's criminal history category, automatically, to the highest possible number (VI).  Fair criticism may include:

> U.S.S.G. section 3AI.4 represents bad anti-terrorism policy for several reasons. First, the Guideline increases a defendant's Criminal History Category to a level VI-the most culpable.  The shift to Criminal History Category VI ensures that a defendant will be sentenced as if he or she were a career criminal, with no empirical evidence that this is true or fair (under the considerations contemplated in 18 U.S.C. § 3553). Second, the Guideline automatically and uniformly increases a defendant's offense level, ensuring a defendant will be sentenced as if his or her offenses are among the most serious offenses addressed by the Sentencing Guidelines, regardless of where the offense level fits on the spectrum of "material support." For example, U.S.S.G. section 3A1.4 punishes the defendant who sends $500 to the social services arm of a DFTO, such as Hezbollah or Hamas, the same as the defendant who attempts to bomb the United Nations, or who provides weapons of mass destruction to al Qaeda. As a result, the sentences under U.S.S.G. section 3AI.4 are often disproportionate to the conduct of conviction. McLoughlin at 57-58.

The defense submits that a reasonable sentence in this case, considering the factors outlined in 18 U.S.C. § 3553, may include a rather steep discount to the application

of the Chapter 3 adjustment. The Guideline refers indiscriminately, through 18 U.S.C. § 2332b(g)(5), to a vast swath of criminal offenses – most far more serious than a doomed attempt to provide material support to a designated foreign terrorist organization. Conduct treated identically under the Guideline provision includes "killing or attempted killing of officers and employees of the United States", "murder or manslaughter of foreign officials, official guests, or internationally protected persons", "Presidential and Presidential staff assassination and kidnaping", "terrorist attacks and other acts of violence against railroad carriers and against mass transportation systems on land, on water, or through the air", "use of weapons of mass destruction", and "acts of nuclear terrorism", to name a few. It may be appropriate to consider where on this spectrum of conduct Mahde's attempted offense fell. Moreover, it may be appropriate to consider whether a blanket increase in Mahde's criminal history category from I to VI is supportable with reference to his personal history and characteristics.

      A benchmark for arguably more egregious conduct is described in *United States v. Van Haften*, 881 F.3d 543 (7th Cir. 2018), seemingly the only 7th Circuit case dealing with this adjustment. There, the defendant was caught travelling to Turkey in an attempt to join ISIS, a designated terrorist organization. After he was apprehended in Turkey, he pleaded guilty to attempting to provide material support to a foreign terrorist organization in violation of 18 U.S.C. § 2339B(a)(1). His writings established a direct causal link between his hatred of the U.S. government and his desire to "join my brothers for the war against American liars" and "kill me some American soldier boys." Id at 543. These statements persuaded the district court that Van Haften sought to join ISIS, at least in part, because he wanted to "retaliate against the government for its

treatment of Muslims in general and specifically for its treatment of the defendant as a designated sex offender. At sentencing, the district court concluded that USSG § 3A1.4 applied, resulting in an advisory guidelines range of 292-365 months, capped at a 15-year statutory maximum. After hearing testimony about the defendant's delusional beliefs and his willingness to reform, the court imposed a below-guidelines sentence of ten years. Without the terrorism enhancement, the range would have been 57-71 months. Both the sentence and the enhancement were affirmed on appeal.

At a macroscopic level, it may be fair to compare Mahde's conduct with that of John Walker Lindh, widely known at the time of his arrest as the American Taliban.  The government advocates for the same sentence for Mahde as that imposed on Lindh pursuant to a plea agreement – a 20-year prison sentence. At the age of 20, Lindh decided to travel to Afghanistan to fight for the Taliban government forces against Northern Alliance fighters. He later acknowledged that he was a member of al-Ansar, a group of Arabic-speaking fighters financed by Osama bin Laden. He surrendered to Northern Alliance forces after his Al Queda foreign fighter's unit surrendered. He was in a makeshift prison when a violent uprising occurred which resulted in the death of a CIA agent.   He was recaptured after a weeklong battle in which only 85 of the original 300-500 prisoners survived. https://en.wikipedia.org/wiki/John_Walker_Lindh, last visited October 6, 2021.

A summary of prosecutions involving allegations of terrorism and, presumably, application of USSG. § 3A1.4, compiled by the National Coalition to Protect Civil Freedoms, is attached hereto. https://www.civilfreedoms.org. The list reads like a Who's Who of terrorism prosecutions.   Comparing Mahde's conduct to the offenses described

and sentences imposed may be instructive.

## The Sentence

Somewhere in the mix, it is appropriate to consider Mahde's age – 19 when first approached by undercover law enforcement and 20 when arrested. His decision-making skills were ripening, but not yet ripe. He was hooked on the prospect of easy money when the first large wad of cash was flashed in his presence in April, 2018. The prospect of a $250,000 payday eclipsed any reservations he may have maintained over the potential for harm that his actions would have created had the prospective buyers been real. His circumstances do not raise the specter of potential danger to the public that might be presented by an individual radicalized by terrorist propaganda. He has his whole life ahead of him and has the tools to make that life something to be proud of. He should be given that opportunity under the strict conditions of supervision proposed in this case. The wisdom necessary to home in on a sentence that is "sufficient, but not greater than necessary" in this case is above the pay grade of any of the lawyers involved. The defense would urge the court to take the forgoing material into account in exercising its discretion.

Respectfully submitted,

*William H. Dazey, Jr.*
William H. Dazey, Jr.
Indiana Federal Community Defenders, Inc.
111 Monument Circle, Suite 3200
Indianapolis, IN 46204
317-383-3520

## CERTIFICATE OF SERVICE

I certify that on October 7, 2021, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the parties of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

                                    *William H. Dazey, Jr.*
                                    William H. Dazey, Jr