UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
|       *Plaintiff*, | ) ) ) |
| v. | ) ) ) Cause No. 1:19-cr-0229-RLY-DML-01 |
| MAHDE DANNON, | ) ) ) |
|       *Defendant*. | ) |

GOVERNMENT'S SENTENCING MEMORANDUM

Comes now the United States of America, by counsel, John E. Childress, Acting United States Attorney for the Southern District of Indiana, and Matthew J. Rinka, Assistant United States Attorney, and respectfully submits this Sentencing Memorandum in the captioned cause.

**I.    Procedural Background**

On March 11, 2021, defendant Mahde Dannon (hereinafter MAHDE Dannon or defendant) pled guilty to one count of Attempting to Provide Material Support and Resources to a Foreign Terrorist Organization, in violation of 18 U.S.C. §§ 2 and 2339B(a)(1). The offense is punishable by a maximum sentence of not more than 20 years' imprisonment, a fine of not more than $250,000, and a term of supervised release of any term of years, including life. In exchange for defendant's plea of guilty, the government agreed to dismiss several additional charges following sentencing in this cause.

On April 14, 2021, the U.S. Probation Office filed an amended Presentence Investigation Report ("PSR"). (Docket 92) In that report, the Probation Office concluded that MAHDE's Base Offense Level was 26 (U.S.S.G. §2M5.3(a)). The probation office then added two levels

because the offense involved the provision of material support with the intent, knowledge, or reason to believe such material support was to be used to commit or assist in the commission of a violent act (U.S.S.G. §2M5.3(b)(1)(E)), and a further 12 levels were added because the offense conduct was a felony that involved, or was intended to promote, a federal crime of terrorism (U.S.S.G. §3A1.4(a)).  The Probation Office then subtracted 3 levels to account for MAHDE's acceptance of responsibility, making MAHDE's Total Offense Level 37.  As the instant offense involved a federal crime of terrorism, MAHDE's Criminal History Category is VI by operation of U.S.S.G. §3A1.4(b).

The guideline range resulting from an Total Offense Level of 37 and a Criminal History Category of VI is 360 months to life imprisonment.  However, as the statutory maximum sentence of incarceration for the offense of conviction is 240 months, 240 months becomes the guideline range. (U.S.S.G. §5G1.1(a))  According to the PSR, "[t]he probation officer [did] not identif[y] any factors listed under 18 U.S.C. § 3553(a) which would justify a sentence outside of the advisory sentencing guideline range."  (Dkt. 92 at 18)

This matter is scheduled for a sentencing hearing on October 14, 2021.  For the reasons set forth below, the government believes the Court should sentence the defendant to a term of imprisonment of 240 months, with a lifetime term of supervised release to follow.

**II.     Summary of Offense Conduct and Relevant Conduct**

In approximately June of 2018, MAHDE Dannon, who was awaiting trial on felony theft charges in Lake County, Indiana, hatched a scheme to illegally obtain and deliver firearms, including stolen firearms, to a convicted felon who was an FBI confidential human source ("CHS").  An exhaustive recitation of the facts of this case is set forth in the Criminal Complaint

filed on May 15, 2019. (Docket No. 2) In the interests of brevity, the government incorporates that recitation of facts herein by reference.

Suffice it to say, between July 2018 and December 2018, MAHDE Dannon obtained and sold approximately 10 firearms and numerous rounds of ammunition to the CHS, who MAHDE Dannon knew to be a convicted felon and prohibited from possessing firearms and ammunition. That lot of ten firearms included firearms that were stolen. During that same time-period, because Mahde Dannon had been charged with felony theft in an information filed in Lake County Superior Court, Mahde Dannon was himself prohibited from receiving firearms and ammunition that had been transported in interstate commerce. While these offenses are themselves exceedingly serious, they pale in comparison to the criminal conduct that would follow.

As noted in the criminal complaint, in approximately July of 2018, MAHDE Dannon introduced his older brother, MOYAD Dannon, to the CHS and suggested that MAHDE and MOYAD could manufacture untraceable "ghost guns" and sell them to the CHS. This fact warrants emphasis: the scheme to illegally manufacture and sell "ghost guns" was one that Mahde Dannon presented to the CHS shortly after their initial meeting, and not criminal activity the CHS (or indeed the FBI) had contemplated at the inception of this investigation.[1] In fact, MAHDE Dannon told the CHS that he and his brother MOYAD had already manufactured ghost firearms, including pistols, using tools they had assembled in their residence.[2] Part of MAHDE

---

[1] Moreover Mahde, on his own initiative, began obtaining "street guns" through various methods and sought to sell those to the CHS before the CHS and the FBI were prepared to undertake "controlled buys" from the defendant.
[2] When the residence was searched in May of 2019, FBI agents recovered a jig used for manufacturing pistols from parts purchased online. This fact is significant because at no time during the investigation did the FBI seek to purchase "ghost" pistols from the Dannon brothers. In other words, the Dannon brothers had obtained this material on their own, independently, in furtherance of their illegal firearms manufacturing scheme.

Dannon's "sale's pitch" to the CHS on why the "ghost gun" endeavor was a good opportunity was the facts that un-serialized weapons were very difficult to trace and therefore worth more money and highly sought after by certain gun buyers.

The CHS later introduced Mahde and Moyad Dannon to an FBI agent who was acting in an undercover capacity. Between July 2018 and December 2018, Mahde and Moyad Dannon began to manufacture untraceable "ghost guns" by purchasing un-serialized firearms parts online and assembling those parts into fully-functioning, .223 caliber, semi-automatic rifles, which they sold to the FBI undercover agent. Between July and December of 2018, Mahde and Moyad Dannon manufactured and sold approximately 8 untraceable, semi-automatic, .223 caliber rifles to the FBI undercover agent. Importantly, the FBI undercover agent purchased the weapons from MAHDE and MOYAD Dannon for significantly less money than the brothers were initially looking to charge.

In November 2018, the Dannon brothers approached the CHS and FBI undercover agent about manufacturing untraceable, fully-automatic, .223 caliber rifles, using much the same process they used to manufacture the semi-automatic rifles. This was a topic that had come up previously in a conversation between the Dannon brothers and the CHS, and during the conversation in November, MAHDE and MOYAD demonstrated significant technical and legal knowledge about manufacturing fully-automatic weapons. And, once again, far from "flashing a wad of cash" at the Dannon brothers, the purchase price for the fully-automatic weapons was carefully negotiated by MOYAD Dannon, who demonstrated an understanding of the value of untraceable machine-guns. Here too, however, the price the FBI undercover agents agreed to pay was significantly less than what MAHDE and MOYAD initially sought.

In December of 2018, Moyad Dannon and an FBI undercover employee (UCE) traveled to Bloomington, Indiana, to meet with another UCE. Following that trip, Moyad expressed concern that the UCE he'd met in Bloomington was a member of a "white militia" and selling fully automatic weapons to such a person might result in the weapons remaining in the United States and ultimately leading the FBI to MOYAD. MOYAD underscored his desire for the weapons they manufactured to be shipped outside of the United States.

In February of 2019, the Dannon brothers built one fully-automatic rifle which they provided to the FBI undercover agent as a means of marketing the Dannons' "ghost gun" building skills to other potential buyers.

Shortly thereafter, MOYAD Dannon accompanied the undercover agent to a location near the U.S. southwest border in an effort to market that rifle, and additional fully-automatic rifles, to a potential buyer ("CHS2"). During that trip, MOYAD Dannon learned that CHS2 sought to ship the fully-automatic weapons to the Middle East, where they would be used by ISIS. Following the trip to the southwest border, both MAHDE and MOYAD Dannon were each aware of the ultimate purported destination of the weapons, and the Dannon brothers agreed to manufacture at least 55 additional fully-automatic "ghost guns" which they understood and believed would be shipped to the Middle East to support ISIS. These 55 fully-automatic "ghost guns" were in addition to the above-referenced fully-automatic rifle that CHS2 purchased from Moyad during the trip to the southwest border.

In furtherance of that agreement, on May 15, 2019, MAHDE and MOYAD Dannon manufactured five untraceable, fully-automatic, .223 caliber rifles from parts they had purchased online. At that time, the Dannon brothers understood and believed that the five automatic rifles

5

would be sent overseas to ISIS. After building the fully-automatic rifles, the Dannon brothers sold all five weapons to undercover FBI employees posing as employees of CHS2. Almost immediately thereafter, the Dannon brothers were arrested by the FBI.

### III.  Defendant's Sentencing Memoranda

#### a.  Defendant's Motives and the Fireams Guidelines

On October 7, 2021, counsel for Dannon filed a sentencing memorandum in which "avarice" was pegged as the motivation for defendant's crimes. Apparently suggesting that if greed and a desire to make money are one's motivations for selling fully automatic weapons to a terrorist group the crime is not as serious, counsel endeavors to equate MADHE Dannon's crimes to a "run-of-the-mill" firearms trafficking case (if such a thing exists) and argues the Court should look to the firearms offense guidelines (U.S.S.G., § 2K2.1) for guidance on fashioning MAHDE Dannon's sentence. For at least two reasons, counsel's arguments in this vein miss the mark.

First, the guideline calculation proffered by counsel as applicable in this case, were it subject to § 2K2.1, is wrong. True the base offense level would be 20, and true MAHDE Dannon would deservedly receive enhancements for the number of firearms involved in the case, possessing stolen firearms, and trafficking in firearms. However, the number of firearms unlawfully possessed or unlawfully sought to be possessed in this case was at least seventy-four (74), not 24.[3] *See*, U.S.S.G., § 2K2.1(b)(1), and Application Note 5. It is therefore a corresponding six (6) level enhancement for the number of firearms involved in this case.

---

[3] As outlined in the criminal complaint, Mahde obtained and transferred 10 "street guns" to the CHS during the course of this investigation. Thereafter Mahde participated in the manufacture and sale of eight (8) semi-automatic and six (6) fully-automatic .223 caliber rifles to the CHS and undercover FBI agents. The brothers also conspired to manufacture at least 50 additional automatic weapons beyond the 6 initially produced.

U.S.S.G. § 2K2.1(b)(1)(C).  Moreover, in addition to receiving a two (2) level enhancement for possession of a stolen Firearm (§ 2K2.1(b)(4)(A)), and an additional four (4) level enhancement for trafficking in firearms (§ 2K2.1(b)(5)), MAHDE Dannon would receive another four (4) level enhancement for possessing or transferring any firearm or ammunition with knowledge, intent, or reason to believe that it would be transported out of the United States (§ 2K2.1(b)(6)(A)).  Thus, assuming *arguendo* MAHDE Dannon stood convicted of 18 U.S.C. § 922 type offenses rather than providing material support to a foreign terrorist organization, his total offense level after acceptance of responsibility would be 33, **not** 29.  For clarity, the advisory sentencing guideline range associated with Offense Level 33 and Criminal History Category I is 135-168 months.  That said, Application Note 11 to § 2K2.1 advises that an upward departure may be warranted where the offense involved multiple National Firearms Act weapons (e.g., machineguns, destructive devices), or military type assault rifles, facts which are clearly present in the instant case.

 Second, the U.S. Sentencing Guidelines are not a smorgasbord to be picked over by defendants looking to minimize the true nature of their criminal conduct.  Indeed, the principal purposes of the Guidelines are to reflect the seriousness of the crime of conviction, to punish and deter, and to avoid unnecessary sentencing disparities.  It is therefore vitally important to correctly calculate and apply the sentencing guideline that corresponds to the offense of conviction.  In this case, were the Court to accept defendant's ill-conceived invitation to apply the firearms guideline (albeit under the guise of a variance), the court will necessarily be omitting from its consideration a critical aspect of the captioned cause that the firearms offense guidelines do not consider, namely that many of the untraceable firearms in question were intended for delivery to a foreign terrorist organization that would use them to commit heinous

crimes against humanity. In the government's view, the nexus to terrorism is the gravamen of the crime of conviction, and therefore should factor heavily into fashioning the correct sentence in this case.

In its sentencing memorandum the defense contends that a reasonable sentence in this case may include a "rather steep discount" to the application of the terrorism enhancement under § 3A1.4(a). At the same time, however, MAHDE's sentencing memorandum glosses over the fact that by allowing MAHDE Dannon to plead guilty to only the 18 U.S.C. § 2339 charge, the government has already "capped" MAHDE's exposure to the Chapter 3 enhancement at 240 months, and afforded him a significant "discount" of 120 months below what his advisory guideline range otherwise would be. It is also worth noting that, when taking the terrorism nexus into consideration in the instant case, imposition of the government's recommended sentence of 240 months, only results in a three (4) level increase in defendant's offense level over that of the § 2K2.1 guideline calculation outlined above. Such an enhancement is hardly "breathtaking" in view of the crimes committed in this case.

    b. **Defendant's Cognitive Development**

In the defendant's sentencing memorandum on mitigation ("mitigation memo"), the defendant seeks to use the issue of normal cognitive development in adolescents and young adults to excuse his calculated, repeated, and extraordinarily dangerous criminal conduct. That effort also misses the mark.

At the time of the criminal conduct in this case, MAHDE Dannon was between the ages of 20 and 21 years old. Nowhere in the mitigation memo is it suggested that MAHDE Dannon suffers from any physical or mental condition that abnormally impedes/impairs his thought processes or brain development, or that his cognitive development is slower than the average

adult male his age. And while studies show that the human brain continues to develop from early childhood through adulthood, nothing in the mitigation memo remotely suggests (nor can it) that this normal brain development process is the cause of MAHDE Dannon's methodical quest to sell untraceable firearms to violent groups, be they drug traffickers in Mexico or ISIS terrorists in the Middle East.

      Likewise, the suggestion in the mitigation memo that MAHDE Dannon sought to manufacture and sell untraceable firearms to drug cartels and ISIS in an effort to help his family and improve the socioeconomic standing of his "fiancée" appears contrived. Everything in the mitigation memo points to the fact that MAHDE Dannon had a stable upbringing, surrounded and supported by family members. His needs were met, he was enrolled in school, and he held several jobs. The mitigation memo states that in 2019 MAHDE Dannon was "devastated" by his inability to support his family and fiancée, so he made a grave error in judgment which led to the instant criminal case (Dkt. 100 at 8). For whatever reason, that assessment ignores the fact that MAHDE Dannon had, prior to 2019, been charged with felony theft in Lake County Indiana for stealing at least 25 pieces of jewelry worth more than $50,000 from his employer.[4] (Dkt. 2 at 9). When interviewed by the Hobart Police Department in connection with that theft MAHDE Dannon admitted he stole the items and said he "had no idea why he stole the jewelry". (*Id.*) That seems an odd response for someone so devasted by their current financial situation that they're driven to a life of crime. What's more, on April 9, 2018, immediately upon release from detention following his arrest on the Lake County theft charges, MAHDE and MOYAD Dannon

---

[4] Put another way, MAHDE Dannon's material support of terrorism was not the first "grave error in judgment" on an otherwise unblemished record. Indeed, by early 2019 Mahde Dannon had been arrested by state authorities in two different jurisdictions and charged (separately) with felony theft, felony criminal confinement, and misdemeanor battery resulting in bodily injury.

9

accompanied another individual to a gun range in central Indiana where MAHDE purchased/received ammunition in violation of federal law, serious criminal conduct that has nothing whatsoever to do with providing for one's family. (Dkt. 2 at 15-16)  In short, MAHDE's admitted theft of $50,000 in jewelry from his employer, and his violation of federal firearms laws while under state felony information, establish with clarity that MAHDE Dannon was engaged in serious criminal conduct well before he met the FBI CHS.

The mitigation memo assessment also makes no effort to explore the lifestyle choices MAHDE Dannon was making at the time he was committing the instant offenses, which appear to undermine the allegedly noble intentions behind his quest for fast money.  For example, the Court will note from the Criminal Complaint, MAHDE owned two vehicles, a BMW sedan and a Ford Mustang, which he was driving prior to and during the commission of the crimes outlined in the indictment in this case.  Also consider that in March of 2019 MAHDE Dannon appeared in Lake County court for a hearing on his pending theft charge.  Following that hearing, MAHDE was arrested on a warrant out of Marion County for stemming from a battery and criminal confinement case from 2018.  (PSR at para. 49)  Upon his release in the Marion County case, MAHDE Dannon met with the CHS to discuss the on-going firearms building enterprise.  During that conversation the CHS asked MAHDE if he had learned anything from his most recent arrest, to which MAHDE responded, "don't get caught," or words to that effect.

### IV.     Fashioning an Appropriate Sentence under 18 U.S.C. § 3553(a)

In light of the facts of this case, the factors set forth in § 3553(a) weigh heavily in favor of a lengthy term of imprisonment for MAHDE Dannon.

There can be no sugarcoating the nature and circumstances of the crime that occurred in this case.  MAHDE sought to, agreed to, and repeatedly attempted to manufacture fully-

automatic weapons for sale to ISIS, a horrifically violent and brutal terrorist organization. In agreeing to supply ISIS with high-power weaponry, MAHDE Dannon necessarily embraced the orthodoxy of ISIS; the use of indiscriminant killing, violence, and terror to achieve the organization's goals. *See, e.g.*, Graham Wood, THE ATLANTIC, *What ISIS Really Wants* (available at https://www.theatlantic.com/magazine/archive/2015/03/what-isis-really-wants/384980/) (illuminating ISIS's views and explaining that "the lack of objective reporting from its territory makes the true extent of the slaughter unknowable, but social-media posts from the region suggest that individual executions happen more or less continually, and mass executions every few weeks"); *see also United States v. Lutchman*, 910 F.3d 33, 36-37 (2d Cir. 2018) ("Lutchman pledged his allegiance to ISIL and stated his intention to 'spill the blood' of nonbelievers."); *United States v. Van Haften*, 881 F.3d 543, 543 (7th Cir. 2018) ("Van Haften fits the typical profile of a terrorist: he believes that ISIS is fighting a holy war against America—a war that will culminate in the establishment of a global caliphate."); *United States v. Farah*, 899 F.3d 608, 612 (8th Cir. 2018) ("Daud and Farah longed for an opportunity to participate in an ISIL operation on American soil, and Omar looked forward to the demise of the United States: '[The infidels] are getting it. Allah will not let America be a superpower for this long . . . . [T]heir time is coming.'").

  And there is no argument here that MAHDE Dannon was ignorant to the hellish levels of violence perpetrated by ISIS in the Middle East and North Africa. Indeed, MAHDE Dannon boasted to the FBI CHS that he had viewed numerous videos depicting ISIS inspired terrorists committing unspeakable acts of violence, including numerous beheadings and the burning alive of a caged Jordanian air force pilot. And there is no shortage of media reported examples of bombings, beheadings, mass shootings, and vehicle attacks perpetrated in the name of ISIS, not

only in places like Iraq and Syria, but also in major international cities including Paris, Nice, London, Berlin, Orlando, and San Bernardino. Much closer to home, the victims of ISIS brutality include Abdul Rahman Kassig, a 2006 graduate of North Central High School in Indianapolis, and former U.S. Army Ranger medic, who abducted by ISIS fighters in Syria. At the time of his abduction, Mr. Kassig was on a humanitarian aid mission to deliver hospital supplies to refugees in that war-torn country.[5] In November of 2014, ISIS released a video confirming that Mr. Kassig had been violently beheaded. Given the number of news reports published in Indiana, and across the U.S., in late 2014 concerning Mr. Kassig's abduction and murder,[6] it is hard to imagine reporting on Mr. Kassig's story escaped MAHDE's notice. ISIS is a group that is at war with the west and unmistakably at war with the United States. Despite intimate knowledge of bloodthirsty methods ISIS employed to further its goals, MAHDE Dannon sought to assist this group further, by supplying them with deadly weaponry. That is what MAHDE Dannon stands convicted of, and these are not "merely" firearms offenses.

While it is abundantly clear from the contents of his electronic devices that MOYAD Dannon was drawn to the barbarity of ISIS and sought to contribute to it, MAHDE Dannon had also admittedly consumed significant quantities of violent ISIS propaganda, yet remained eager to support ISIS by supplying them with untraceable automatic weapons. That kind of allegiance to ISIS, and committed willingness of foreign nationals like MAHDE Dannon to support their jihad, are essential to ISIS advancing its goals. *See* Wood, *What ISIS Really Wants*.

---

[5] https://www.newsweek.com/peter-kassig-isis-islamic-state-quran-syria-iraq-al-qaeda-282599
[6] See, e.g., https://www.indystar.com/story/news/2014/10/03/reports-indianapolis-man-named-next-isis-target/16667489/; https://www.indystar.com/story/news/2014/11/16/indy-native-kassig-destined-great-things/19146169/; https://www.reuters.com/article/us-mideast-crisis-beheading/u-s-hostage-peter-kassig-is-killed-by-islamic-state-idUSKCN0J008W20141116; https://www.usatoday.com/story/news/world/2014/11/16/peter-kassig-islamic-state-claims-beheading-syria/19128067/.

The point does not need to be belabored: ISIS has killed countless people, and seeks, without exaggeration, the destruction of the United States of America. *See, e.g.*, *United States v. Suarez*, 893 F.3d 1330, 1332 (11th Cir. 2018) ("When the FBI arrested Harlem Suarez, he had already declared allegiance to the Islamic State of Iraq and al- Sham (ISIS), attempted to recruit others to join him in destroying the United States"), *cert. denied*, No. 18-6808, 2019 WL 113456 (U.S. Jan. 7, 2019); *Doe v. Mattis*, 889 F.3d 745, 749 (D.C. Cir. 2018) (ISIS "controls territory in Iraq and Syria, and has perpetrated and aided terrorism there and around the world, killing several thousand civilians, including American aid workers and journalists."); *United States v. Khusanov*, 731 F. App'x 19 (2nd Cir. 2018) (noting that ISIS has a "history of particularly violent conduct" and "target[s] members of the United States armed forces serving abroad and encourage[s] terrorist acts within this country") (citation omitted).

And there can be no doubt that MAHDE Dannon truly meant to support ISIS. He was well aware of the destination of the weapons he was building, and he went to great lengths to procure parts necessary to manufacture the firearms in question, and to ensure those firearms would be difficult—if not impossible—to trace back to MAHDE and MOYAD. That was a very real effort. And importantly, MAHDE was not at all dissuaded from his quest to supply ISIS with weapons by his prior encounters with law enforcement and the pending felony charges against him in Lake and Marion Counties.

While law enforcement intercepted MAHDE and MOYAD Dannons' firearms before they could actually reach ISIS and kill anyone, that fact does not mitigate the dangerous plot that MAHDE and MOYAD had concocted and set in motion. The nature and circumstances of offenses in this case are shocking. MAHDE Dannon's actions were inherently dangerous and implicate the Material Support statute's *raison d'etre*. Section 2339B "criminalizes a range of

conduct that may not be harmful in itself but that may assist, even indirectly, organizations committed to pursuing acts of devastating harm." *United States v. Farhane*, 634 F.3d 127, 148 (2d Cir. 2011). As the Supreme Court has stated, "[t]he material-support statute is, on its face, a preventive measure - - it criminalizes not terrorist attacks themselves, but aid that makes the attacks more likely to occur." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 35 (2010). In *Boim v. Holy Land Found, for Relief & Dev.*, 549 F.3d 685, 690 (7th Cir. 2008) (en banc), the Seventh Circuit held that giving money to Hamas, in violation of Section 2339B, necessarily involves an act "dangerous to human life." As *Boim* reasoned, providing financial support to Hamas, "by augmenting Hamas's resources, would enable Hamas to kill or wound, or try to kill, or conspire to kill more people[.]" *Id*. at 694. *Boim*'s reasoning is doubly persuasive in this case, where the support the defendants sought to provide were fully-automatic, military grade firearms.

      The counter argument that the history and characteristics of the defendant somehow weigh in favor of a variance from the advisory guideline range are simply not persuasive. At the time of his arrest in the instant case, MAHDE Dannon was living in Fishers, Indiana, with his parents and siblings. He was employed, and had a network of friends and relatives with whom he socialized. Indeed, the PSR and defendant's mitigation expert report paint a picture of MAHDE Dannon as coming from a stable, two-parent, home where both parents participated in his nurturing and upbringing and where both parents place reasonable expectations on MAHDE in the hope that he would become a respectable and contributing member of society. Unfortunately, MAHDE Dannon repeatedly chose a different path.

It is beyond argument that MAHDE Dannon's actions directly implicate the concerns driving the prohibition on providing material support to a foreign terrorist organization and, those actions merit a harsh sanction.

## IV.     Conclusion

For the foregoing reasons, the United States submits that the only sentence that will accomplish the statutory goals of sentencing in this case is a sentence of 240 months imprisonment, followed by a lifetime term of supervised release.  Such a sentence will take into consideration the need for the sentence to reflect the grave nature of the offense, provide general and specific deterrence, and protect the public from future crimes of the defendant.

Accordingly, the government asks the Court to impose a sentence of 240 months of imprisonment, followed by a lifetime term of supervised release

Respectfully Submitted,

JOHN E. CHILDRESS
Acting United States Attorney

By:     s/*Matthew J. Rinka*
       Matthew J. Rinka
       Assistant United States Attorney
       Deputy Criminal Chief, National Security Unit

## CERTIFICATE OF SERVICE

I hereby certify that on October 13, 2021, a copy of the foregoing Government's Sentencing Memorandum was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

By: s/*Matthew J. Rinka*
Matthew J. Rinka
Assistant United States Attorney